

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2016

## STATE OF TENNESSEE v. RICHARD W. WILBURN

**Appeal from the Circuit Court for Rutherford County**
**Nos. F-74351, M-73937, M-73940 & M-73973    David M. Bragg, Judge**

---

### No. M2016-00704-CCA-R3-CD

---

The Defendant, Richard W. Wilburn, was sentenced to an effective ten-year sentence for his guilty-pleaded convictions to one count of initiating the methamphetamine manufacturing process and three counts of driving on a revoked license, second offense or more. On appeal, the Defendant contends that the trial court erred by applying enhancement factor 10—the Defendant had no hesitation about committing a crime when the risk to human life was high—to increase his sentence for initiating the manufacturing methamphetamine process because, he asserts, there was no proof that anyone was endangered by his actions. He also submits that the trial court erred by denying any form of alternative sentencing based upon his need for drug treatment. Following our review, we find no abuse of discretion in the trial court's sentencing decision. Accordingly, the judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Gerald L. Melton, District Public Defender, and Russell N. Perkins, Assistant District Public Defender, for the appellant, Richard W. Wilburn.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Dana S. Minor, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

In July 2015, the Rutherford County Grand Jury charged the Defendant with driving on a revoked license, second offense or more (case number M-73937); driving on

a revoked license, second offense or more, and violation of the open container law (case number M-73940); and driving on a revoked license, second offense or more (case number M-73973). See Tenn. Code Ann. §§ 55-10-416, -50-504. In September of the same year, the Defendant was indicted for initiating a process intended to result in the manufacture of methamphetamine (case number F-74351). See Tenn. Code Ann. § 39-17-435. The Defendant thereafter entered a guilty plea disposing of all four cases—pleading guilty to three counts of driving on a revoked license, second offense or more, and to initiating the methamphetamine manufacturing process, and the open container charge was dismissed. Pursuant to the terms of the plea agreement, the Defendant was classified as a Range I, standard offender, although he qualified for a higher range classification, and his four sentences were to run concurrently. The length of the sentences and the manner of service was left to the trial court's discretion.

At the subsequent sentencing hearing, Detective Curtis Brinkley, with the Narcotics Unit of the Rutherford County Sheriff's Department, testified that he investigated a methamphetamine complaint on March 26, 2015. Det. Brinkley had been advised by a "State Park Ranger Supervisor" that "multiple items consistent with a methamphetamine lab[oratory]" had been found "disposed of across a fence line" that was "kind of parallel" with the Defendant's property. When Det. Brinkley arrived at the home, he found "components consistent with methamphetamine production" in the Defendant's yard—a gas generator, which "consist[s] of a plastic bottle with some tubing coming out the top of it"; "a bag on a front porch that had multiple gas generators and some syringes, [and] a glass jar" inside; and ammonium nitrate. Following the issuance of a search warrant, more items were discovered inside the home confirming the presence of a methamphetamine laboratory—sulfuric acids, including drain cleaner; "a glass plate with coffee filters that contained white residue," field-testing positive for methamphetamine; salt; plastic bags; "some miscellaneous tools that could be associated with fixing or administering the products together"; and pseudoephedrine.

According to Det. Brinkley, they found a total of five gas generators outside of the Defendant's home between the one in the yard and the others on the front porch. He explained that "[t]he gas generators are what are needed to actually finish the cooking process, to actually crystalize the meth." Det. Brinkley further described the cooking process as "dangerous" because it frequently caused explosions. Det. Brinkley was then asked if children were in the area when he arrived. He replied,

> Once we were conducting our investigation, the trailer that kind of sits within a few feet away—I say a few feet. You know, 20, 30, maybe 50. There were children there. And they had, obviously, kid toys outside. And we were speaking to them. The children were present at that time. They

weren't outside when we first arrived. But there were children present within the property.

Det. Brinkley said that the gas generators, especially the one found in the Defendant's yard, were in "dangerous proximity" to the children.

Additionally, the Defendant was renting the home. According to Det. Brinkley, the homeowners decided to leave the home under quarantine because the clean-up process was too cost prohibitive for them, so the residence was uninhabitable.

The Defendant then testified on his own behalf. The Defendant claimed that he did not know how to manufacture methamphetamine, being "more of a junky than a maker." The Defendant said that he had been a cocaine user for approximately eight years when his neighbor, Billy Teal, introduced him to methamphetamine. He further testified that he smoked marijuana and began drinking at fourteen or fifteen years of age. According to the Defendant, his addiction problems likely started "at birth" because his father gave him beer "in a bottle to make [him] go to sleep."

The Defendant claimed that it was Mr. Teal who manufactured the methamphetamine at the Defendant's home because it was "central[ly] located" and away from Mr. Teal's children. According to the Defendant, Mr. Teal's residence was about one hundred feet away from his. Because they were using his home, the Defendant "started keeping the stuff to make [methamphetamine] at [his] house." "[E]verything was okay for a while[,]" the Defendant said, "until one day [Mr. Teal] had [the Defendant] get the stuff, and [the Defendant] put it in [his] barn." According to the Defendant, it was the very "next day" that the police showed up and "took [his] house and everything in it[.]" When asked if he ever participated in the manufacturing process, the Defendant answered affirmatively, stating that he had "held the coffee filter." The Defendant asserted that he never sold any of the methamphetamine and that he used ninety percent of it, with Mr. Teal taking the rest. The Defendant explained, "It wasn't about making money. It was about getting high."

The Defendant claimed that, if he was granted some sort of alternative release, he would "try [his] best . . . to stay away from any drug." According to the Defendant, he had applied for placement in the drug court program, which request had been denied, and he had "written to halfway houses and a substance abuse center[,]" with no responses. He stated that he had previously participated in "a weekend" of drug treatment at Cumberland Heights, however, that was all of the help he had ever received.

The Defendant acknowledged that he had a lengthy criminal record, including a history of driving offenses. However, he claimed that, because he was a self-employed carpenter, he had no choice but to drive himself around for work. According to the

Defendant, he could return to work "with the builders that [he had] worked for" if not incarcerated. The Defendant asserted that he was not a drug dealer and explained that most of his other criminal offenses involved his drug habit, either drug crimes or theft offenses where he was stealing things to buy drugs.

The Defendant claimed that he wanted help for his drug problem and asserted that he would "try [his] best" to follow the rules of supervised release. He noted that he had become a "pod trustee" while in jail over the past eight months, "clean[ing] up after people and distribut[ing] their clothes, feed[ing] them[,]" and "[m]aintain[ing] the block[.]" When asked why he had not sought drug treatment before, the Defendant responded, "[B]ecause I kind of sort of didn't grow up." According to the Defendant, he could live with his mother if placed on probation.

On cross-examination, the Defendant admitted that he assisted Mr. Teal with manufacturing methamphetamine. He claimed that they used his house rather than Mr. Teal's because the Defendant's house was "vacant" while Mr. Teal's wife and kids were always at home. The Defendant said that he did not know the manufacturing process was dangerous and that they only used his house "to keep it away from the kids, period." When asked why they "left some of this lying around the front porch and the backyard[,]" he said that he "wasn't paying attention to what [he] was doing" because he was "sort of messed up."

The Defendant admitted that he had "been in and out" of the criminal justice system his entire life. The Defendant acknowledged that he had "violated probation quite a few times" in the past, explaining that his failure to comply was "[d]ue to [his] drug habit[.]" Regarding his continuing to drive for work although his license had been revoked, the Defendant said, contrary to his earlier testimony, that he was going to "give up carpentry" and find a job close to where he lived. The Defendant confessed that he had six driving on a revoked license charges at the time he pled guilty to these three. Despite his "repeated inability to be successful on probation," the Defendant claimed he could comply with "law and order" now. However, he acquiesced that he was "a bad candidate" for probation.

Following the conclusion of proof, the trial court considered the enhancement factors set forth in Tennessee Code Annotated section 40-35-114. Noting that the Defendant, given his "extensive prior criminal history[,]" qualified for a higher classification range than bargained-for under the plea agreement, the trial court applied factor (1) that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1). The court found that factor (10)—the Defendant had no hesitation about committing a crime when the risk to human life—applied "to cooking

and manufacturing methamphetamine" and commented on the risk to Mr. Teal "or anybody else that may have been there at the time it was being cooked or processed." See Tenn. Code Ann. § 40-35-114(10). The court did not find any mitigating factors to be applicable. See Tenn. Code Ann. § 40-35-113. The trial court then sentenced the Defendant to ten years for the inititaion of a process intended to result in the manufacture of methamphetamine and eleven months and twenty-nine days for each driving on a revoked license conviction.

The trial court also denied any alternative sentence, first noting the Defendant's prior criminal history, which involved "somewhere between [forty] and [fifty] prior convictions" spanning nearly thirty years. The trial court then commented that, based upon the Defendant's own testimony, he was not a suitable candidate for release into the community. Discussing the Defendant's drug problem, the trial court observed,

> I can only say that I wish that in past days when faced with these types of problems, he had sought out and used some of his funds to get some help to correct his behavior and find a way to deal with his addiction issues, as opposed to . . . not only continuing to use, but when somebody says if you ever try this stuff, you'll throw rock at cocaine, he jumped right into meth. And meth will kill you. I mean, if it doesn't blow up, it's going to kill you anyway.

Based upon the Defendant's prior number of probation violations, the trial court felt he had a low potential for rehabilitation. The trial court also said that there was no reason to believe that the Defendant would abide by the terms of probation in light of his equivocal statement that he would "give it his best effort to try." The trial court was also concerned that society be protected from future criminal conduct by the Defendant, that measures less restrictive than confinement had frequently been applied to the Defendant unsuccessfully, that probation might depreciate the seriousness of the offense, and that incarceration might be an effective deterrent to others. See Tenn. Code Ann. § 40-35-103(1). Making one last remark about the Defendant's need for drug treatment, the trial court stated,

> [Defendant], I hope while you are incarcerated—if you are incarcerated in a facility that provides some either drug court—which currently the Department of Corrections, I think, only offers in one facility in the State—or any addiction treatment or even just A.A. or N.A. meetings, I hope you'll take advantage of those and begin to talk to people, find a way to deal with the issues you find yourself dealing with other than by continuing the use of substances that will result in your death at an untimely time.

You have a family. Your mom is here. There are people that love you that want you to live. But that's a decision that you have to make.

It is from this sentencing decision that the Defendant timely appeals. The case is now before us for our review.

## ANALYSIS

On appeal, the Defendant takes exception to the trial court's enhancement of his methamphetamine manufacturing sentence to ten years and its complete denial of any alternative sentence. We address each in turn.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

Moreover, appellate courts may not disturb the sentence even if we had preferred a different result.  See Carter, 254 S.W.3d at 346.  The burden of showing that a sentence is improper is upon the appealing party.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

## I. Length of Sentence

The Defendant argues that his ten-year sentence for initiation of a process intended to result in the manufacture of methamphetamine is excessive because the trial court improperly applied enhancement factor (10)—the Defendant had no hesitation about committing a crime when the risk to human life was high—to increase sentence, and therefore, according to the Defendant, he should have received the minimum sentence of eight years.   The State responds that the trial court properly utilized enhancement factor (10) to increase the Defendant's sentence because his actions posed a high risk to human life, but even if factor (10) was misapplied, the trial court also relied on the Defendant's criminal record, which he does not dispute, and the sentence length is justified.

Our amended Sentencing Act no longer imposes a presumptive sentence.  Carter, 254 S.W.3d at 343.  Instead, Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.
> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the

length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

As a Range I, standard offender convicted of a Class B felony, the Defendant's sentencing range was between eight to twelve years. See Tenn. Code Ann. 40-35-112(a)(2). Here, the trial court specifically mentioned the criteria in section 40-35-210(b) before rendering its sentencing decision. The court also stated that it was considering the Defendant's "potential for rehabilitation or treatment" in determining the sentence length. See Tenn. Code Ann. § 40-35-103(5).

Regarding enhancement factor (10), the trial court determined that factor (10) applied "to cooking and manufacturing methamphetamine" and commented on the risk to Mr. Teal "or anybody else that may have been there at the time it was being cooked or processed." The Defendant submits that there was "no proof offered that anyone was endangered by any activity of [the Defendant]." This court has held that a trial court is not warranted in using enhancement factor (10) to enhance a sentence involving a Schedule II controlled substance[1] due to the "nature and circumstances" of the substance, reasoning that "the legislature has already considered the inherent nature of the various drugs in its setting of punishment." State v. Keel, 882 S.W.2d 410, 421-22 (Tenn. Crim. App. 1994) (citations omitted). However, the court specifically stated that possible factual scenarios existed that would warrant a trial court applying this factor in a Schedule II controlled substance case. Id. at 421.

For example, this court has upheld the application of factor (10) to a defendant who was manufacturing methamphetamine "in a motel room with lighter fluid and other explosive materials and . . . there could have been a fire or explosion[.]" State v. Ronald Lee West, Jr., No. E2013-00830-CCA-R3-CD, 2014 WL 1920676, at *9-10 (Tenn. Crim. App. May 13, 2014). Likewise, the record supported application of factor (10) in a case where a defendant led several officers on a fifty-seven-minute chase in a car that

---

[1] Methamphetamine is classified as a Schedule II controlled substance. See Tenn. Code Ann. § 39-17-408(d)(2).

"contained a 'rolling meth lab.'" State v. Michael Vaughn, No. M2006-01341-CCA-R3-CD, 2007 WL 2350099, at *1-3, 5 (Tenn. Crim. App. Aug. 14, 2007). Here, Det. Brinkley testified that Mr. Teal's trailer was "20, 30, maybe 50" feet from the Defendant's residence and that children's toys were present in the shared yard. When Det. Brinkley arrived on the scene, the children were not outside at first; however, he said that "there were children present within the property" and that he spoke with them. Of great significance, Det. Brinkley said that the gas generators, especially the one found in the yard, were in "dangerous proximity" to the children. Based upon this proof, we cannot conclude that the trial court erred by applying factor (10) to the Defendant's sentence.

Regardless of the applicability of factor (10), it is well-settled, as stated above, that, even if the trial court misapplies an enhancement factor, the sentence will be upheld as long as "there are other reasons consistent with the purposes and principles of sentencing" supporting the trial court's determination. Bise, 380 S.W.3d at 706. The Defendant does not dispute his extensive criminal history spanning over thirty years and the trial court's application of factor (1). The Defendant qualified for a higher classification range than bargained-for under the plea agreement, and the Defendant's prior criminal history, as noted by the trial court, involved "somewhere between [forty] and [fifty] prior convictions[.]" The Defendant admitted at the sentencing hearing that he had a lengthy record, including a history of driving offenses, drug crimes, and theft offenses. In light of the Defendant's criminal history, factor (1) is more than sufficient to justify the trial court's imposition of a ten-year sentence.

After considering the applicable law and the record, we conclude that the trial court's imposition of a ten-year sentence is presumptively reasonable and that the Defendant has failed to rebut that presumption. Thus, the record evidencing no abuse of discretion, the Defendant's within-range sentence of ten years is affirmed.

## II. Alternative Sentencing

A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6)(A). However, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347. Tennessee Code Annotated section 40-35-102(6) is now only advisory. See Tenn. Code Ann. § 40-35-102(6)(D). A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1).

Regardless, an offender is eligible for probation if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. See Tenn. Code Ann. § 40-35-303(a). While the trial court was required to automatically consider probation as a sentencing option, see Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, see State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

Again, the consideration of favorable candidacy for alternative sentencing extends to a defendant "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony[.]" Tenn. Code Ann. § 40-35-102(6)(A). When a defendant is to be considered a favorable candidate, the State can overcome such consideration with "evidence to the contrary." Id. Because the Defendant was convicted of a Class B felony, he is not to be considered a favorable candidate for alternative sentencing. Moreover, as noted above, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing, and it is a defendant's burden to establish his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citation omitted). Importantly, we observe that the State had no burden to justify confinement in this case.

Here, the trial court based its denial of any alternative sentence on the Defendant's prior criminal history, the Defendant's prior number of probation violations, and the Defendant's own testimony. The trial court found that the Defendant had a low potential for rehabilitation. The trial court was also concerned that society be protected from

-10-

future criminal conduct by the Defendant, that measures less restrictive than confinement had frequently been applied to the Defendant unsuccessfully, that probation might depreciate the seriousness of the offense, and that incarceration might be an effective deterrent to others. See Tenn. Code Ann. § 40-35-103(1).

The presentence report reflects multiple failed attempts at sentences of release into the community. The Defendant has repeatedly been granted the largess of an alternative sentence throughout his criminal career. The Defendant acknowledged that he had "been in and out" of the criminal justice system his entire life and that he had "violated probation quite a few times" in the past. As the trial court noted, the Defendant equivocated as to whether he would be able to abide by the rules this time, saying only that he would "try [his] best." The Defendant's criminal history is significant and supports the denial of an alternative sentence. The trial court followed the statutory sentencing procedure, properly weighing the factors and principles in denying alternative sentencing, and placing its reasoning for denying an alternative sentence on the record.

The Defendant also argues that the trial court should have sentenced him under the "special needs" provision of the Community Corrections Act, possibly following a sentence of split confinement, because he needs drug treatment. See Tenn. Code Ann. § 40-36-106(c). The "special needs" provision provides that "[f]elony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution," may be considered eligible for punishment in the community under the provisions of this chapter. Id., see also State v. Boston, 938 S.W.2d 435, 437 (Tenn. Crim. App. 1996).

Initally, the State asserts that any argument for sentencing under this provision is waived because the Defendant raises this suggestion for the first time on appeal. Here, the trial court did not explicitly consider the eligibility requirements for a sentence to the Community Corrections Program, likely in large part due to the parties' arguments at the sentencing hearing. However, the Defendant did argue for an alternative sentence generally, and the trial court did address the statutory considerations governing alternative sentencing in rendering its decision. We decline to find waiver of the issue. Additionally, the trial court's having determined that the Defendant was unsuitable for alternative sentencing generally, we discern no error in the failure to inquire further as to the Defendant's eligibility for community corrections specifically. In so concluding, we again remark that the Defendant, as a Class B felon, was not to be considered a favorable candidate for alternative sentencing from the outset. See Tenn. Code Ann. § 40-35-102(6)(A).

Turning to the issue at hand, in order to be eligible for community corrections sentencing under subsection (c), a defendant must be ineligible for punishment in the community under subsection (a). Arguably, the Defendant's convictions for assault (three misdemeanors), resisting or evading arrest (four misdemeanors and one felony), and disorderly conduct (one misdemeanor) demonstrate a present or past pattern of behavior indicating violence and demonstrate a pattern of committing violent offenses. See State v. Michael E. Bunting, No. E2005-00321-CCA-R3-CD, 2006 WL 1994573, at *6 (Tenn. Crim. App. July 18, 2006) (citations omitted). Accordingly, he would be ineligible for community corrections under section (a). See Tenn. Code Ann. § 40-36-106(a)(1)(E)(F). Also, in order to be eligible for community corrections sentencing under subsection (c), the offender must be eligible for probation. Boston, 938 S.W.2d at 438. We have already concluded that the Defendant is statutorily eligible for probation.

Next, a determination that a defendant is suitable for placement in the program also requires the following findings: (1) the offender has a history of chronic alcohol, drug abuse, or mental health problems; (2) these factors were reasonably related to and contributed to the offender's criminal conduct; (3) the identifiable special need (or needs) are treatable; and (4) the treatment of the special need could be served best in the community rather than in a correctional institution. Boston, 938 S.W.2d at 439. In the present case, though the trial court did not specifically address community corrections or the special needs provision, the trial court fully considered and discussed the Defendant's drug problem and corresponding need for treatment. The trial court denied any alternative sentence despite the Defendant's drug problem because of the Defendant's extensive criminal history and mulitple probation violations. The trial court commented that, although the Defendant had stated a desire for help with his drug problem, he had not put forth any meaningful effort to seek treatment in the past. The trial court did not err by concluding that the Defendant's drug issues would best be treated in a correctional facility rather than in the community. Accordingly, the Defendant has failed to establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded to the trial court's denial of alternative sentencing.

CONCLUSION

Based upon the foregoing, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-12-